## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA KINKAID, | ) | CASE NO. 1:23-CV-01115-PAB |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | PAMELA A. BARKER |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I.     INTRODUCTION

Plaintiff, Brenda Kinkaid ("Ms. Kinkaid"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI"). (ECF No. 1.) U.S. District Judge Pamela A. Barker has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

### II.     PROCEDURAL HISTORY

Ms. Kinkaid filed an application for SSI on September 17, 2020, alleging a disability onset date of July 5, 2012. (Tr. 129-38.)[1] Her application is related to degenerative disc disease, allergies, high blood pressure, and accentuated thoracic kyphosis. (Tr. 52, 164.) Her application was denied initially and upon reconsideration. (Tr. 72-76, 78-80.) An administrative law judge ("ALJ") held a telephone hearing on May 5, 2022, due to the COVID-19 pandemic. (Tr. 29-50.) Ms. Kinkaid,

---

[1] The administrative transcript ("Tr.") appears at ECF No. 6 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record citations are to the CM/ECF-generated page numbers.

represented by counsel, and a vocational expert ("VE") testified. (*Id.*) The ALJ issued a written

decision on May 25, 2022, finding Ms. Kinkaid was not disabled within the meaning of the Social

Security Act. (Tr. 15-23.) The ALJ's decision became final on April 3, 2023, when the Appeals

Council declined further review. (Tr. 1-3.) Ms. Kinkaid filed a Complaint on June 2, 2023,

challenging the Commissioner's final decision. (ECF No. 1.) She raises a single, multi-part

assignment of error:

> (1) Whether the ALJ failed to identify substantial evidence supporting the residual
> functional capacity finding, failed to evaluate the medical opinions pursuant
> [to] the regulations, and failed to evaluate Plaintiff's allegations pursuant to the
> appropriate legal standards.

(ECF No. 7, PageID#629.)

## III.     BACKGROUND INFORMATION

### A.   Personal, Educational, and Vocational Experience

Ms. Kinkaid was born in 1968, and she was 51 years on the application filing date. (Tr.

21.) She is married and has no children. (Tr. 34, 522.) She has a driver's license. (Tr. 34.) She has

a twelfth-grade education and did not complete any specialized job training, trade, or vocational

school. (Tr. 165.)

### B.   Relevant Non-Medical/Medical Opinion Evidence

#### 1.   *State Agency Opinions*

In May 2021, Abraham Mikalov, M.D., reviewed Ms. Kinkaid's medical record at the

initial level of consideration. Dr. Mikalov opined that Ms. Kinkaid could occasionally lift and/or

carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk with normal breaks for

six hours during a normal workday; and sit with normal breaks for six hours during a normal

workday. (Tr. 55.) Dr. Kinkaid also opined that Ms. Kinkaid could occasionally climb ladders,

ropes, or scaffolds, and frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.

(Tr. 56.) Leon Hughes, M.D., reviewed the record at the reconsideration level in October 2021. He agreed with Dr. Mikalov's findings. (Tr. 63-64.)

### 2. *Bilal Mahmood, M.D.*

In May 2021, Dr. Mahmood conducted a consultative examination of Ms. Kinkaid. (Tr. 521-24.) Ms. Kinkaid reported a history of back problems. (Tr. 521.) She stated her pain was exacerbated by prolonged, standing, walking, and sitting. (*Id.*) She rated her pain intensity at 3/10 at the time of examination and said that her pain is variable on most days but greater than 3/10. (*Id.*) Dr. Mahmood noted that Ms. Kinkaid had tenderness of her low back muscles, but said her physical examination was otherwise unremarkable. (Tr. 524.) Dr. Mahmood opined that Ms. Kinkaid did not have significant limitations with lifting or carrying weight, and noted no limitations in bending, stooping, crouching, and squatting. (*Id.*) Dr. Mahmood also opined that Ms. Kinkaid did not have any relevant visual, communicative, or workplace environmental limitations. (*Id.*)

### 3. *Casey Norris, D.O.*

In October 2021, Dr. Norris conducted a consultative examination of Ms. Kinkaid. (Tr. 531-38.) Ms. Kinkaid reported worsening back pain. (Tr. 536.) On examination, Ms. Kinkaid walked with a normal gait without the use of an assistive device. (Tr. 537.) She was able to walk heel to toe, walk on toes, hop, and squat. (*Id.*) Her straight leg raise testing was positive on the right at 45 degrees and the left at 30 degrees. (*Id.*) There was tenderness to palpation and diffuse back pain. (*Id.*) Ms. Kinkaid's motor examination was normal with normal bulk and tone of all major muscle groups and 5/5 strength throughout the upper and lower extremities. (*Id.*) She had normal sensation to pinprick and light touch throughout. (*Id.*) Ms. Kinkaid's range of motion examination was without limitation in her cervical spine, lumbar spine, upper extremities, and

3

lower extremities. (*Id.*) Dr. Norris opined Ms. Kinkaid would be able to stand/walk four to five hours in an eight-hour workday. (Tr. 538.) Dr. Norris concluded that Ms. Kinkaid could carry less than 30 pounds frequently and more than 40 pounds on occasion. (*Id.*) Dr. Norris noted that Ms. Kinkaid's "[o]ther limitations in function include crawling, kneeling, crouching, climbing, stooping, and bending." (*Id.*)

### C. Relevant Medical Evidence

#### 1. *Left Shoulder Impairment*

Prior to her September 17, 2020, protective filing date, Ms. Kinkaid had a history of a rotator cuff tear of the left shoulder. Dr. Viau treated Ms. Kinkaid for left shoulder pain on June 5, 2019. (Tr. 296-98.) Ms. Kinkaid reported she had left shoulder pain for over three weeks after working in her yard. (Tr. 297.) X-rays showed mild acromioclavicular (AC) joint[2] arthritis. (*Id.*) She reported taking over-the-counter anti-inflammatories, hydrocodone, and using a sling for three days. (*Id.*) Upon examination, Ms. Kinkaid had increased pain with abduction and forward flexion. (Tr. 297.) Her impingement test was positive on the left. (*Id.*) Dr. Viau administered a subacromial cortisone injection and referred Ms. Kinkaid to physical therapy. (*Id.*)

On August 8, 2019, Ms. Kinkaid received treatment for left anterolateral shoulder pain. (Tr. 299-301.) The History of Past Illness section of the treatment notes indicate Ms. Kinkaid completed physical therapy without improvement. (Tr. 300.) She had increased pain with abduction and forward flexion past 90 degrees. (*Id.*) She had "persistent" shoulder pain despite injections with NSAIDs. (*Id.*) Upon examination, her impingement test was positive. (*Id.*)

---

[2] The acromioclavicular joint is the junction between the acromion (the portion of the shoulder blade that meets the clavicle) and the clavicle (the bone that runs from the sternum to the scapula). *See Acromioclavicular Joint*, Stedman's Medical Dictionary 462930 (Nov. 2014).

An August 13, 2019, MRI of Ms. Kinkaid's left shoulder revealed: (1) moderately severe tendinopathy of the supraspinatus[3] with a superimposed focal full-thickness tear of the supraspinatus at the left of the lateral margin of the acromion, measuring 10 mm transversely by 9 mm in AP dimension; (2) mild rotator cuff tendinopathy; and (3) mild spurring along the undersurface of the acromion with moderately severe degenerative change of the AC joint. (Tr. 304-05.)

Dr. Viau treated Ms. Kinkaid again for left shoulder pain on August 28, 2019. Ms. Kincaid's MRI showed severe tendinopathy with a small full-thickness cuff tear with spurring along the anterior undersurface of the acromion and degenerative changes at the AC joint. (Tr. 307.) Dr. Viau scheduled surgery for Ms. Kincaid's left shoulder (*see id.*), and she underwent surgical repair on September 16, 2019. (*See* Tr. 315, 385-88.) Following this surgery, her strength was 3/5 but her range of motion was noted to be "improving." (Tr. 311, 313, 315.) On July 6, 2020, Dr. Viau treated Ms. Kinkaid for recurrent left shoulder pain. (Tr. 316-18.) Examination revealed no surgical scar, but increased pain with abduction and forward flexion past 90 degrees. (Tr. 317.)

## 2. *Lumbar Spine Impairment*

Prior to the September 2020 protective filing date, a February 24, 2018, x-ray revealed no acute osseous abnormality but degenerative disc disease and degenerative joint disease most prominent at L3-L4, where there was degenerative subluxation. (Tr. 246-47.) At a February 28, 2018, lumbar evaluation, Ms. Kinkaid reported worsening symptoms that were increased with bending, sitting, walking, lying down, and sitting and rising at times. (Tr. 262.) Her range of motion was limited and painful with flexion and extension in lying. (Tr. 264.) She underwent

---

[3] The supraspinatus muscle is a rotator cuff muscle of the shoulder joint. *See Supraspinatus (Muscle)*, Stedman's Medical Dictionary 571910 (Nov. 2014).

physical therapy during early 2018, as well as treatment with meloxicam, followed by injections. (Tr. 287-318, 333.)

On March 8, 2018, Dr. Viau treated Ms. Kinkaid for lower back pain related to degeneration of her lumbosacral intervertebral disc. (Tr. 287-89.) Ms. Kinkaid reported that her lower back pain had been "more symptomatic for the last [two] or [three] months." (Tr. 288.) She reported occasional radiation into her right lateral thing. (*Id.*) Upon examination, Ms. Kinkaid had mild restriction with lumbar fluxion and extension. (*Id.*) Dr. Viau's treatment notes from Ms. Kinkaid's April 26, 2018, visit indicates that physical therapy was discontinued due to Ms. Kinkaid's poor response to treatment. (Tr. 291.) Upon examination, Ms. Kinkaid demonstrated increased back pain with all lumbar motion. (*Id.*)

A June 4, 2018, MRI revealed mild degenerative disease at L3-L4 level, no significant spinal canal stenosis or neural foraminal narrowing, and normal alignment. (Tr. 362.) Ms. Kinkaid visited Dr. Viau for treatment. (Tr. 293-94.) Upon examination, Ms. Kincaid had pain with lumbar motion, particularly with lumbar flexion. (Tr. 294.) Dr. Viau offered Ms. Kinkaid an epidural steroid injection for her back due to her "poor response to therapy and NSAIDs." (*Id.*)

On September 9, 2019, Ms. Kinkaid had a primary care visit for hypertension. (Tr. 342.) Her range of motion was normal. (*Id.*) Ms. Kinkaid attended a follow-up orthopedics appointment on November 2, 2020, with Dr. Viau. (Tr. 433.) She reported 50% relief of her back pain for 3 months from her epidural steroid injections. (*Id.*) Her physical examination revealed she had paraspinal spasm with all lumbar motion but no radicular component. (*Id.*)

On January 5, 2021, Ms. Kinkaid attended a primary care visit for hypertension. (Tr. 446.) She denied numbness or tingling in her hands and feet. (*Id.*) Her neurological examination was normal, with no focal deficit, intact coordination, and a normal gait. (Tr. 450.) On February 1,

2021, Ms. Kinkaid reported that she received at least 50% pain relief for three months from her injection. (Tr. 501.) Dr. Viau wrote that Ms. Kinkaid's activities of daily living have "been equally aggravating," and she was requesting another injection. (*Id.*) Upon examination, Ms. Kinkaid had paraspinal spam with no radiculopathy. (*Id.*) Dr. Viau administered an epidural steroid injection. (Tr. 502.)

Ms. Kinkaid received another epidural injection on May 3, 2021. (Tr. 506.) She reported the epidural injections "help[ed] dramatically [for three] months" providing 50% or more relief. (*Id.*) On May 5, 2021, Ms. Kinkaid attended a primary care visit for diabetes and hypertension. She reported that her blood pressure increased following an epidural injection in her back. (Tr. 464.) A review of systems indicated she was positive for arthralgias and back pain. (Tr. 465.) Her blood pressure was 140.84 and her BMI was 47.57. (Tr. 466.) Her musculoskeletal examination was normal. (*Id.*)

On November 8, 2021, Ms. Kinkaid returned for a visit with Dr. Viau regarding her chronic low back pain. (Tr. 540-42.) Dr. Viau noted that Ms. Kinkaid reported that the epidural injections helped her pain for three months, "indicat[ing] at least 60% relief." (Tr. 540.) Ms. Kinkaid requested another injection. (*Id.*) She reported pain at the level of seven to eight out of ten and that full activities of daily activities were "equally aggravating." (*Id.*) She reported intermittent leg discomfort, but more back pain than leg pain. (*Id.*) Upon examination, Ms. Kinkaid had increased pain with lumbar flexion and paraspinal spam, but no motor sense reflex asymmetry in her lower extremity. (*Id.*)

On December 20, 2021, Dr. Viau treated Ms. Kinkaid for lower back pain due to lumbar degenerative disc disease. (Tr. 543-47.) Ms. Kinkaid reported 50% or more relief from her epidural injections for three months after her prior injection on August 3, 2021. (Tr. 543.) Upon

examination, Ms. Kinkaid had increased lower back pain with lumbar motion but no radiculopathy. (*Id.*) Dr. Viau administered another epidural steroid injection. (Tr. 545.)

### D.  Relevant Hearing Testimony

#### 1.  *Ms. Kinkaid's Testimony*

Ms. Kinkaid testified that she is unable to work due to issues with her spinal discs, including difficulties lifting often and going down stairs. (Tr. 35.) She goes grocery shopping once every one to two weeks, but she requires assistance. (Tr. 36.) If a grocery cart has too much weight, she is unable to push it. (*Id.*) If an item is too high or too low on the shelf, she is unable to reach or stoop for the item if her back is hurting. (*Id.*) She has no issues with personal hygiene. (Tr. 37.)

Ms. Kinkaid stated that she can lift no more than ten pounds on "some" days but not all. (Tr. 37.) She testified that she is unable to use the leaf blower because it is too heavy, and using it will cause her shoulders to hurt to the point she is unable to use her left shoulder the next day. (*Id.*) She stated that she can walk without sitting for about a block and stand for about 15 to 30 minutes. (*Id.*) She can sit for 20 minutes before needing to stand. (Tr. 38.)

Ms. Kinkaid testified that on a typical day she gets up, takes a shower or cleans herself at the sink, gets dressed, takes her medications, and takes care of errands such as driving to the post office to mail her bill payments. (*Id.*) She cooks and washes dishes, but sometimes she stops washing the dishes and finishes washing them the next day. (Tr. 38-39.) She reported she enjoys reading and doing cross-stitch, sitting outdoors, and gathering with friends. (Tr. 39.)

Ms. Kinkaid stated that she receives shots every three months and takes Tylenol for her back. (Tr. 40.) Her doctor administered a cortisone shot for her left shoulder. (*Id.*) She testified that she will likely need another cortisone shot. (*Id.*) Her doctors are treating her lower back with only cortisone shots because she had complications with anesthesia after a prior shoulder surgery.

(Tr. 41.) She testified that she has difficult reaching overhead and side-to-side with her left arm. (Tr. 40-41.)

### 2.  *Vocational Expert's Testimony*

The ALJ asked the VE whether an individual with Ms. Kinkaid's age, education, and experience could perform work at the light exertional level, except the individual could frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 43.) The VE opined that this individual could perform work as an office helper/clerical assistant, cafeteria attendant, or mailroom clerk. (Tr. 43-44.)

The ALJ modified the hypothetical question to include the limitations of occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; and occasionally balancing, stooping, kneeling, crouching, and crawling. (Tr. 44.) The VE testified that the same jobs would be available. (*Id.*)

The ALJ asked whether an individual with the same limitations from the second hypothetical could perform work if additionally limited to occasional overhead reaching with her left upper extremity. (*Id.*) The VE stated that the individual could still perform the same opined jobs. (*Id.*)

The ALJ then modified the hypothetical to include a limitation for four hours of standing or walking during the day. (*Id.*) The VE testified that the jobs would still be available. (Tr. 44-45.) The VE confirmed that his testimony was consistent with the *Dictionary of Occupational Titles,* but the areas that were not addressed by the publication were based on his experience in the labor market. (Tr. 46.)

Ms. Kinkaid's counsel asked the VE for clarification regarding the four-hour standing and walking limitation. (Tr. 47.) The VE explained that the cutoff before the jobs were classified as

sedentary was standing and walking for four hours out of an eight-hour workday. (Tr. 47.) Ms. Kinkaid counsel clarified the question stating that "anything less than four hours gets us to sedentary." (Tr. 48.) The VE testified that due to the technology available today, light jobs required a person to be on their feet four out of eight hours per day. (*Id.*)

## IV. THE ALJ'S DECISION

The ALJ first determined that Ms. Kinkaid has not engaged in substantial gainful activity since September 17, 2020, the application filing date. (Tr. 17.) The ALJ then determined that Ms. Kinkaid has the following severe impairments: lumbar degenerative disc disease and obesity. (Tr. 17-18.) However, the ALJ determined that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18.) The ALJ determined, after consideration of the entire record, that Ms. Kinkaid had the residual functional capacity to perform work at the light exertional level, except she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 18-21.)

The ALJ then determined that Ms. Kinkaid has no past relevant work. (Tr. 21.) The ALJ further determined that transferability of job skills is not an issue because Ms. Kinkaid does not have past relevant work. (Tr. 22.) The ALJ next determined that considering Ms. Kinkaid's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Kinkaid can perform, including employment as an office helper, cafeteria attendant, and mail room clerk. (*Id.*) Thus, the ALJ found that Ms. Kinkaid has not been under a disability within the meaning of the Social Security Act since September 17, 2020, the application filing date. (Tr. 23.)

## V.      LAW AND ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the

11

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. **Analysis**

#### 1. *The ALJ Properly Evaluated the Opinion Evidence*

Ms. Kinkaid generally argues that the ALJ failed to apply proper legal standards in determining the physical limitations in the RFC because the ALJ's evaluations of the opinions of Dr. Norris and the state agency physicians (Drs. Mikalov and Hughes) were inadequate, and that the ALJ's decision does not allow for meaningful judicial review. (ECF No. 7, PageID#638-44.)

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. See 20 C.F.R. § 404.1520(c)(1)-(2).

An error in an ALJ's evaluation of the opinion evidence may be harmless in one of three circumstances: (i) when the opinion was "so patently deficient that the Commissioner could not possibly credit it"; (ii) when the Commissioner made findings consistent with the opinion; or (iii) the Commissioner otherwise met the goals of the regulations by indirectly attacking the

supportability or consistency of the opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[4]

### a. Dr. Norris' Opinion

Ms. Kinkaid generally argues that the ALJ's evaluation is in error because the ALJ did not adequately articulate the supportability and consistency of Dr. Norris' opinion and did not build a logical bridge between the evidence and the result.

The ALJ assessed Dr. Norris' opinion as follows:

> The opinions of Dr. Norris at Exhibit 30F are partially persuasive, to the extent he opined the claimant would have some limitations in postural functions of crawling, kneeling, crouching, climbing and stooping. However, Dr. Norris did not opine to the degree of limitations. Additionally, the remaining opinions are not well supported, including the limitation to stand/walking 4-5 hours in an 8-hour day. This is unsupported by Dr. Norris's own examination findings, noting a completely normal physical examination with exception of a positive straight leg raise testing. The claimant had full range of motion, full strength, normal gait, and normal sensation throughout. The claimant's conservative treatment further is inconsistent with this standing/walking limitation.

(Tr. 21.)

The ALJ adequately articulated the supportability factor when assessing the persuasiveness of Dr. Norris' opinion. As reproduced above, the ALJ determined that Dr. Norris did not opine to the degree of Ms. Kinkaid's postural limitations. (*Id.*) Regarding the remaining limitations, the ALJ observed that they were unsupported by Dr. Norris' own examination findings, which noted a completely normal physical examination with the exception of a positive straight leg raise testing. (*Id.*)

---

[4] Although the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations. *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 WL 5176523, at *5 n.4 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 WL 3056108, at *11 n.8 (W.D. Tenn. July 20, 2021); *Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 WL 5892621, at *4 (N.D. Ohio Sept. 29, 2020).

The ALJ also addressed the consistency of Dr. Norris' opinion that Ms. Kinkaid's conservative treatment was inconsistent with his standing and walking limitation that Ms. Kinkaid could stand/walk four to five hours in eight-hour day. (Tr. 21.) The ALJ summarized and discussed Dr. Norris' findings earlier in the decision. (*See* Tr. 20.) Notably, the ALJ noted that Ms. Kinkaid had full range of motion, full strength, normal, gait, and normal sensation throughout. (Tr. 21; *see* Tr. 537.) Specifically, the ALJ observed that Ms. Kinkaid's treatment was infrequent and conservative, consisting of epidural steroid injections every three months. (Tr. 21; *see* Tr. 20.)

Ms. Kinkaid appears to advance a logical bridge challenge by citing to evidence considered by the ALJ, and then arguing that – when looking at other portions of the record – such evidence logically demonstrates the supportability and consistency of Dr. Norris' opinion. For example, she asserts that it is unclear how the ALJ found the examination findings were inconsistent with Dr. Mahmood's no limitation findings, but did not find that the same examination findings would support Dr. Norris' assessment of exertional limitations related to standing/walking. (*See* ECF No. 7, PageID#641.)

But such an argument constitutes an impermissible invitation to reweigh and reassess the evidence in her favor. Although Ms. Kinkaid would reweigh the evidence differently, she does not demonstrate that the ALJ's findings regarding Dr. Norris' opinion lacks substantial evidence. *See Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 406 (6th Cir. 2018) ("We decide only whether there was substantial evidence to support the ALJ's RFC determination. If so, we defer to that decision even in the fact of substantial evidence supporting the opposite conclusion.") (internal citations omitted); *Harrod v. Comm'r of Soc. Sec.*, No. 3:17CV1839, 2018 WL 3869897, at *16 (N.D. Ohio Aug. 15, 2018) ("Although Plaintiff clearly believes the ALJ should have assessed more restrictive limitations based on her interpretation of the medical record, that belief does not

15

establish a violation of the substantial evidence standard."). The ALJ's decision is not subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).

Ms. Kinkaid also maintains that she cannot perform work at the light exertional level because the ALJ limited her to occasional postural limitations, and that such a limitation would prevent her from performing the standing and walking requirements of light work. (ECF No. 7, PageID#639-40.) While Ms. Kinkaid's argument is difficult to discern, she appears to argue that because the ALJ determined that occasional postural limitations were warranted, then it must follow that there should have been more restrictive standing/walking limitations that would limit her beyond the light exertional level. She also appears to again argue that the ALJ did not build a logical bridge between the evidence and the ALJ's determination when rejecting Dr. Norris' opinion regarding her standing/walking limitation. These arguments are not well-taken.

Social Security Ruling ("SSR") 85-15 states that "[i]f a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." SSR 85-15, 1985 WL 56857, at *7. This same SSR states that "crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world or work. This is also true of kneeling (bending the legs at the knees to come to rest on one or both knees)." *Id.* Ms. Kinkaid thus fails to demonstrate that—because she had occasional postural limitations—she could not perform light work or explain how that would warrant greater standing/walking limitations.

The VE's response to the ALJ's hypothetical also supports the ALJ's RFC determination. In the instant case, the ALJ posed a hypothetical that included all the limitations he found

supported by the record and ultimately included those limitations in the RFC. (Tr. 43-44.) The VE identified the following jobs: office helper/clerical assistance, cafeteria attendant, and mailroom clerk. (Tr. 43-44.) The VE's testimony is substantial evidence for the ALJ's Step Five finding. *See Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (citation omitted); *see also Atkinson v. Comm'r of Soc. Sec.*, No. 3:20-CV-01482-JGC, 2021 WL 5774131, at *9 (N.D. Ohio Oct. 27, 2021), *report and recommendation adopted*, 2021 WL 5770247 (N.D. Ohio Dec. 6, 2021); *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006). And even if the ALJ credited Dr. Norris' opinion regarding more restrictive standing and walking limitations, Ms. Kinkaid does not demonstrate she is unable to perform the jobs identified by the VE. (Tr. 44-45, 47.) Thus, she does not establish remand on this basis.

Finally, Ms. Kinkaid argues that the ALJ should have found her disabled because the Medical Vocational Guidelines ("the Grid") Rule 201.12 direct a finding of disability for an individual with her vocational characteristics, *i.e.,* approaching advanced age and limited to sedentary work. (ECF No. 7, PageID#643.) However, the ALJ limited Ms. Kinkaid to a reduced range of light work and substantial evidence (*i.e.*, the state agency opinions, the opinions of Drs. Mahmood and Norris, and other record evidence) supported the ALJ's RFC determination. (Tr. 23.) Thus, Ms. Kinkaid does not demonstrate that the Grid Rule is applicable to her case. Accordingly, this argument lacks merit. *See Simpson v. Comm'r of Soc. Sec. Admin.*, No. 1:16-cv-00314, 2017 WL 436467, at *13 (N.D. Ohio Jan. 5, 2017), *report and recommendation adopted*, 2017 WL 414712 (N.D. Ohio Jan. 31, 2017) (finding that claimant could not establish that Grid Rule was applicable where the ALJ limited to light work rather than sedentary work and substantial evidence supported the ALJ's RFC determination); *Coleman v. Astrue*, No. 1:10CV0663, 2010 WL 5129216, at *9 (N.D. Ohio Dec. 10, 2010) ("She argues the ALJ should have found her capable

of performing only sedentary work. Further, if he had done so, the medical vocational guidelines would have directed a finding of 'disabled.'… As previously explained, the Court finds that the ALJ's conclusion of medium work was supported by substantial evidence.").

### b. State Agency Opinions

Ms. Kinkaid acknowledges that the ALJ found the state agency opinions "generally persuasive" and concluded that they were "consistent with the relatively normal physical examination findings on examinations, including at her two consultative examinations." (ECF No. 7, PageID#642 (citing Tr. 21, 520-38.)) However, she argues that the ALJ's decision should be remanded because the ALJ did not discuss the abnormal findings. (*Id.*)

The ALJ assessed the state agency physicians' opinions as follows:

> The opinions of the state agency medical consultants are generally persuasive and consistent with the claimant's relatively normal physical examination findings on examinations, including at her two consultative examinations (Exhibit 29F; 30F). However, the undersigned finds the evidence received at the hearing, documenting the claimant's continued need for epidural steroid injections every three months for back pain, combined with her testimony at the hearing regarding her difficulty climbing stars, warrant greater postural limitations. Therefore, the undersigned finds the claimant can occasionally climb ramps and stairs; no climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl.

(Tr. 21.)

To the extent that Ms. Kinkaid attempts to raise a "cherry picking" argument, this claim lacks merit. Although some evidence supports Ms. Kinkaid's position that she is more limited due to her back impairments, there is "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). Earlier in the decision, the ALJ here discussed evidence that weighed in favor of Ms. Kinkaid's position. For example, the ALJ acknowledged that Ms. Kinkaid had a history of back pain, and that diagnostic tests revealed degenerative disc

and joint disease. (Tr. 19.) The ALJ even noted that Ms. Kinkaid reported pain that was exacerbated by prolonged standing, walking, and sitting at her consultative examination with Dr. Mahmood. (Tr. 20; *see* Tr. 524.)

The ALJ also observed that Ms. Kinkaid's examination revealed tenderness of her lower back paraspinal muscles, but her physical examination was otherwise unremarkable. (*Id.*) The ALJ also discussed Ms. Kinkaid's second consultative examination with Dr. Norris. Notably, Ms. Kinkaid emphasizes Dr. Norris' "not relatively normal" (ECF No. 7, PageID#642) findings of positive straight leg raise raising on examination, tenderness to palpation, and diffuse back pain. While the ALJ acknowledged this evidence, the ALJ also noted that the remainder of Dr. Norris' examination revealed normal findings. (Tr. 20; *see* Tr. 536-37.) Although Ms. Kinkaid argues that the ALJ should have discussed clinical findings noting painful lumbar motion[5] (Tr. 284, 506, 540, 543) and paraspinal spasm (Tr. 433, 501, 506), it is well-established that "[a]n ALJ need not discuss every piece of evidence in the record for the ALJ's decision to stand." *Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195 (6th Cir. 2020); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006).

Ms. Kinkaid's argument that the ALJ did not adequately articulate the consistency factor in assessing the persuasiveness of the state agency opinions is not well-taken. To the extent that Ms. Kinkaid argues that the ALJ erred by not explicitly restating the evidence in his consistency analysis, this argument lacks merit. While the ALJ did not rearticulate the specifics of each record when discussing the state agency's opinion, it was not improper for the ALJ to satisfy his burden by referring to his prior discussion and assessment of such evidence in finding that the state agency opinions were consistent with the record. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457

---

[5] Notably, the ALJ, when discussing Ms. Kinkaid's course of treatment, noted that Ms. Kinkaid's December 2021 examination revealed lower back pain increased with lumbar motion, with no radiculopathy. (Tr. 20.)

(6th Cir. 2016). A review of the record and the ALJ's decision reveals that the ALJ appropriately discussed the relevant evidence and findings earlier in the decision, in support of the ALJ's opinion evaluation. (Tr. 19-20.)

Specifically, the ALJ referred to the "relatively normal physical examination findings" from Ms. Kinkaid's two consultative examinations with Dr. Mahmood and Dr. Norris. (Tr. 21.) Despite reports of problems stemming from her back impairments, Ms. Kinkaid demonstrated relatively normal findings such as normal gait, 5/5 strength in her upper and lower extremities, and range of motion without limitation in her cervical and lumbar spine as well as her upper and lower extremities. The earlier discussion of the evidence provides an adequate logical bridge between the evidence and the result reached by the ALJ. Although Ms. Kinkaid cites evidence supporting potentially greater limitations stemming from her back impairments, a reviewing court must affirm where the ALJ's decision is supported by substantial evidence, as there is a "zone of choice within which the decisionmaker[] can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.3d 535, 545 (6th Cir. 1986). In this case, substantial evidence supports the ALJ's evaluation of the state agency opinions. Thus, I recommend that the Court reject this argument because it lacks merit.

### 2. *Substantial Evidence Supports the ALJ's Assessment of Ms. Kinkaid's Subjective Allegations.*

Ms. Kinkaid argues that the ALJ violated SSR 16-3p by failing to properly consider Ms. Kinkaid's statements regarding her impairments and providing reasons not supported by substantial evidence. For the following reasons, this argument is not well-taken.

The ALJ is responsible for evaluating a claimant's subjective complaints. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.3d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In

evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms; and any other factors bearing on the limitations of the claimant to perform basic functions. *Id.*

The ALJ need not analyze all seven factors but should show that they considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3p, 2017 WL 5180304, at *2.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486

F.3d at 248-49), *report and recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Regarding Ms. Kinkaid's left shoulder impairment, the ALJ complied with the regulations in evaluating her subjective complaints. Ms. Kinkaid argues that the ALJ failed to assess the combined effect of her left shoulder impairment in combination with her other impairments. But the ALJ explicitly noted that the "objective evidence fails to document the presence of any impairment or *combination of impairments* that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the range of work described above." (Tr. 20 (emphasis added)). Reading the decision as a whole and with common sense, the ALJ explained his reasoning earlier in the decision regarding those complaints. Specifically, the ALJ acknowledged Ms. Kinkaid's history of a left shoulder rotator cuff tear prior to the protective filing date. However, the ALJ noted that the "[r]ecords since her protective filing do not evidence any related complaints, nor did she evidence any left shoulder limitations on examinations." (Tr. 17; *see* Tr. 521-28, 531-38.) And, even if the ALJ failed to discuss her alleged left shoulder impairment after Step Two, Ms. Kinkaid's argument should be rejected because she does not point to any evidence *after the protective filing date* showing that the ALJ's analysis was in error. *See Richards v. Barnhart*, No. 3:03 CV 7728, 2004 WL 3017042, at *2 (N.D. Ohio Dec. 30, 2004) ("Accordingly the relevant evidence begins with May 21, 2001, the date of plaintiff's SSI application. Any description of earlier medical evidence merely provides background about the plaintiff's medical conditions before she became eligible for SSI benefits.").

Ms. Kinkaid cites to the record, consisting mostly of her subjective reports, and asserts that the ALJ's decision is not supported by substantial evidence because she alleged greater limitations, and the ALJ failed to identify an inconsistency between her pain complaints and the record. (ECF

No. 7, PageID#645-46.) This argument lacks merit. Regarding Ms. Kinkaid's primary reliance of her subjective reports, "an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence." *Sell v. Comm'r of Soc. Sec.*, No. 5:21-cv-00007, 2022 WL 2610531, at *13 (N.D. Ohio Jan. 6, 2022) (citations omitted), *report and recommendation adopted sub nom. Sell v. Kijakazi*, 2022 WL 4479932 (N.D. Ohio Sept. 27, 2022).

Here, the ALJ considered the evidence and reasonably concluded that Ms. Kinkaid's subjective allegations were not consistent with the evidence. (Tr. 20.) First, the ALJ considered the objective evidence. The ALJ acknowledged that Ms. Kinkaid has a history of back problems and an examination revealed tenderness of the lower back paraspinal muscles. (Tr. 20; *see* Tr. 524.) The ALJ noted, however, that Ms. Kinkaid's physical examination was otherwise unremarkable. (*Id.*) The ALJ observed that other examinations noted normal findings, including full range of motion, strength, sensation, and a normal gait. (Tr. 21; *see* Tr. 450, 537.) An ALJ may assess the consistency of a claimant's subjective complaints by objective medical evidence. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 543 (6th Cir. 2007); *Bullock v. Comm'r of Soc. Sec.*, No. 1:22-cv-1038, 2023 WL 4285130, at *3-4 (N.D. Ohio June 30, 2023).

Next, the ALJ considered Ms. Kinkaid's treatment history. (Tr. 19-20); *see* SSR 16-3p, 2017 WL 5180304, at *9. The ALJ observed that Ms. Kinkaid had an "infrequent and conservative" course of treatment, consisting of epidural steroid injections every three months. (Tr. 20.) The ALJ observed that on occasion these steroid injections provided substantial pain relief for pain rated at 50% or more for 3 months. (Tr. 20; *see* Tr. 433, 463, 466, 543.) The ALJ noted that there was no evidence that Ms. Kinkaid required specialized pain management with narcotics, nor that any surgical intervention had been indicated. (*Id.*)

23

Ms. Kinkaid challenges the ALJ's finding that there was no evidence that she required specialized pain management with narcotics. (ECF No. 7, PageID#648-49.)  She contends that the ALJ failed to consider the side effects of her medications. Allegations of a medication's side effects must be supported by objective medical evidence. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665-66 (6th Cir. 2004). Here, Ms. Kinkaid relies on one treatment note indicating she had GI intolerance to oxycodone (Tr. 449), and two notes indicating that she had allergies to opioids (Tr. 521, 536). But failure to consider the side effects of medications is subject to harmless error analysis. *See, e.g.*, *Tennant v. Comm'r of Soc. Sec.*, No. 1:16-cv-29, 2016 WL 5799164, at *5 (W.D. Mich. Oct. 5, 2016).

It is true that Ms. Kinkaid has an allergy to opioid medication and thus had a good reason for not taking opioids. SSR 16-3p, 2017 WL 5180304, at *10. But the ALJ's accurately characterized Ms. Kinkaid's treatment—consisting of epidural steroid injections every three months and no surgical intervention—as conservative. *Piercy v. Comm'r of Soc. Sec.*, No. 5:18 CV 2214, 2019 WL 6051552, at *13 (N.D. Ohio Nov. 15, 2019) (noting that conservative treatment is a "valid consideration" in assessing claimant's subjective symptoms); *Adams v. Comm'r of Soc. Sec.*, No. 1:21-CV-02199-PAB, 2023 WL 2373541, at *11 (N.D. Ohio Jan. 23, 2023) ("Courts…have described epidural injections, nerve blocks, and radiofrequency ablations as conservative treatment."), *report and recommendation adopted sub nom. Adams v. Kijakazi*, 2023 WL 2347368 (N.D. Ohio Mar. 3, 2023); *Dinkins v. Comm'r of Soc. Sec.*, No. 1:13 CV 373, 2014 WL 1270587, at *11 (N.D. Ohio Mar. 26, 2014) (classifying as "conservative" treatment measures including narcotic pain relievers, anti-inflammatory medications, and neurological medications).

Even if the ALJ's characterization of Ms. Kincaid's treatment as conservative was in fact erroneous, an ALJ providing an inaccurate reason is harmless error where the ALJ articulated other valid reasons for discounting a claimant's subjective complaints. *See Garcia v. Comm'r of Soc. Sec.*, No. 1:16 CV 2682, 2018 WL 838371, at *12 (N.D. Ohio Feb. 12, 2018) ("The undersigned finds, however, that even if this reason lacks support in the record, it is harmless because the ALJ's other reasons provided substantial evidence."). Here, the ALJ presented other valid reasons besides the objective medical evidence that served to build a logical bridge between the evidence and the ALJ's determination.

For example, the ALJ also considered Ms. Kinkaid's daily activities. *See* 20 C.F.R. § 404.1529(c)(3)(1); SSR 16-3p, 2017 WL 5180304, at *7. The ALJ observed that Ms. Kinkaid reported activities such as grocery shopping with assistance, performing some household chores, cooking, and gathering with friends. (Tr. 20; *see* Tr. 38-39.) The Sixth Circuit has recognized that an ALJ "may consider a claimant's household and social activities in evaluating complaints of daily pain." *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). Ms. Kinkaid argues that consideration of her daily activities was improper because "[t]he fact that [she] had some activities and was not bedridden does not mean [she] could perform a range of light work." (ECF No. 7, PageID#649.) If the ALJ had in fact determined based solely on Ms. Kincaid's daily activities that she was not disabled, that conclusion would be erroneous. *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011) (finding that the claimant's testimony that she could grocery shop, go to the pharmacy, attend church, prepare meals, dress herself, and drive 30 minutes per day were "hardly consistent with eight hours' worth of typical work activity"); *Rogers*, 486 F.3d at 248-49 (concluding similarly with respect to claimant's testimony

that she could drive, clean, care for two dogs, do laundry, read, do stretching exercises, and watch the news).

But the ALJ did not base his determination solely on Ms. Kincaid's daily activities. Rather, as the Commissioner points out, the ALJ noted that "[w]hile these activities alone do not establish an ability to perform sustained work activities, the undersigned finds *when considered with the evidence as a whole*, they support they support the residual functional capacity above." (Tr. 20 (emphasis added)); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997).

The ALJ also determined that the state agency opinions, which limited Ms. Kinkaid to a reduced range of light work, were persuasive. (Tr. 21; *see* Tr. 55-56, 63-64.) He relied on the state agency opinions in crafting the RFC. (*See* Tr. 21.) An ALJ's consideration of state agency findings is relevant to an ALJ's assessment of a claimant's subjective complaints. *See Benson v. Colvin*, No. 3:13 CV 67, 2013 WL 5797747, at *14 (N.D. Ohio Oct. 28, 2013) ("The Court finds the ALJ did not improperly assess [the claimant's] credibility…. As the ALJ correctly notes, state agency physician Bacalla and ME Gatens both concluded Benson was capable of a limited range of light exertional work."); *Quinn v. Comm'r of Soc. Sec.*, No. 1:23-CV-00029-CEH, 2024 WL 183960, at *7 (N.D. Ohio Jan. 17, 2024); *Tomlin v. Comm'r of Soc. Sec.*, No. 4:23-CV-01192-CEH, at *11 (N.D. Ohio Apr. 12, 2024).

Ms. Kinkaid also argues that the ALJ's SSR 16-3p analysis is incorrect because Ms. Kincaid alleged greater limitations, and the ALJ did not explain why these allegations (other than climbing stairs) were unsupported. (ECF No. 7, PageID#646.) To the extent that Ms. Kinkaid is asserting that the ALJ should have discussed her entire hearing testimony and address each complaint, this argument lacks merit because an ALJ "need not exhaustively discuss each of the[] factors or all of the evidence in the record but need only acknowledge the factors and discuss the

evidence that supports his decision." *Smith v. Comm'r of Soc. Sec.*, No. 1:20-cv-1366, 2021 WL 3566696, at *15 (N.D. Ohio May 28, 2021), *report and recommendation adopted*, 2021 WL 2800549 (N.D. Ohio July 6, 2021); *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

The ALJ considered Ms. Kinkaid's subjective complaints involving her impairments, what she could still do, what she alleged she could no longer do, and then evaluated the evidence. (Tr. 19-20.) The ALJ ultimately concluded that Ms. Kinkaid's allegations were not consistent with the evidence. (Tr. 20.) As discussed above, the ALJ provided valid reasons for why the ALJ did not credit Ms. Kinkaid's subjective complaints. While Ms. Kinkaid disagrees with how the ALJ weighed the evidence, this does not suffice to demonstrate that the ALJ's analysis lacks substantial evidence. *See Jones*, 336 F.3d at 477. Accordingly, I recommend that the Court reject these arguments because they lack merit.

### 3. The Residual Functional Capacity Limiting Ms. Kinkaid to a Reduced Range of Light Work was Supported by Substantial Evidence.

Finally, Ms. Kinkaid argues that the ALJ's RFC determination is incorrect because the ALJ interpreted "raw medical data" by not adopting the opinions of the examining physicians, Drs. Mahmood and Norris. (ECF No. 7, PageID#650-51.) This argument is not well-taken.

Ms. Kinkaid's argument is puzzling because Dr. Mahmood's opinion was *less restrictive* than the ALJ's RFC determination. Specifically, Dr. Mahmood opined that Ms. Kinkaid had no limitations with sitting, standing, or walking, and did not need an assistive device for short and long distances and uneven terrain. (Tr. 524.) Dr. Mahmood further opined that Ms. Kinkaid did not have significant limitations with lifting or carrying weight had no limitations bending, stooping, crouching, and squatting (*Id.*)

27

If Ms. Kinkaid is trying to argue that the ALJ erred merely because he assessed a more restrictive RFC that that opined by Dr. Mahmood, this argument fails. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions than the state agency reviewers opined"); *Kopcial v. Kijakazi*, No. 1:23-cv-00201, 2024 WL 1131059, at * (N.D. Ohio Mar. 15, 2024) ("[The medical sources'] opinions certainly undercut any argument that greater restrictions necessary than those assessed by the ALJ. Any perceived error by the ALJ accrued to Plaintiff's benefit, as he found greater limitations than any medical source."); *Berrier v. Comm'r of Soc. Sec.*, 2021 WL 6881246, at *9 (N.D. Ohio Sept. 10, 2021) ("[E]ven if the ALJ erred by failing to explain why she found Claimant to be more limited than the medical experts opined, the error is harmless as it was in Claimant's favor."), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022).

Next, although Dr. Norris opined that Ms. Kinkaid had some—not specified as to the degree—limitations, the ALJ determined that these limitations were not supported by Dr. Norris' own examination findings. Specifically, as discussed above, the physical examination was relatively normal except for a positive straight leg raise test. (Tr. 21; *see* Tr. 531-38.) And I agree with the Commissioner that even if the ALJ had credited Mr. Norris' more restrictive standing and walking limitations, Ms. Kinkaid nevertheless fails to demonstrate that she would be unable to perform the jobs opined by the VE. Specifically, the VE testified that the identified jobs' "essential functions will be able to be performed within the four out of eight hours stand[ing] or walking." (Tr. 44-45, 47.) And the state agency findings also support the ALJ's RFC determination. Notably, the state agency physicians found Ms. Kinkaid to be less limited but the ALJ imposed further

limitations. (Tr. 18, 21, 55-56, 63-64.) Thus, Ms. Kinkaid does not demonstrate she is entitled to remand on this basis.

Here, Ms. Kinkaid does not present evidence that the ALJ merely determined the RFC based on a lay understanding of raw medical data. Instead, the record reveals that the ALJ arrived at this conclusion after reviewing objective medical evidence, Ms. Kinkaid's oral statements, and the medical opinion evidence. As discussed above, the RFC determination is consistent, and arguably more restrictive, than the state agency opinions. Accordingly, Ms. Kinkaid fails to demonstrate error in this regard.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision DENYING Ms. Kinkaid's application for SSI.


Dated: April 23, 2024                                   */s Jennifer Dowdell Armstrong*
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need

conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).